**Electronically Filed
Supreme Court
SCOT-17-0000777
09-NOV-2018
02:02 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

---

IN THE MATTER OF CONTESTED CASE HEARING RE
CONSERVATION DISTRICT USE APPLICATION (CDUA) HA-3568
FOR THE THIRTY METER TELESCOPE AT THE MAUNA KEA SCIENCE RESERVE,
KA'OHE MAUKA, HĀMĀKUA, HAWAI'I, TMK (3) 404015:009

---

SCOT-17-0000777, SCOT-17-0000811, and SCOT-17-0000812

APPEAL FROM THE BOARD OF LAND AND NATURAL RESOURCES
(BLNR-CC-16-002 (Agency Appeal))

NOVEMBER 9, 2018

DISSENTING OPINION BY WILSON, J.

## I.    Introduction

The degradation principle.  The Board of Land and Natural Resources (BLNR) grounds its analysis on the proposition that cultural and natural resources protected by the Constitution of the State of Hawai'i and its enabling laws lose legal protection where degradation of the resource is of sufficient severity as to constitute a substantial adverse

1

impact. Because the area affected by the Thirty Meter Telescope Project (TMT or TMT project) was previously subjected to a substantial adverse impact, the BLNR finds that the proposed TMT project could not have a substantial adverse impact on the existing natural resources. [BLNR Decision and Order, p. 219, COL 180] Under this analysis, the cumulative negative impacts from development of prior telescopes caused a substantial adverse impact; [BLNR Decision and Order, p. 220, COL 183] therefore, TMT could not be the cause of a substantial adverse impact. As stated by the BLNR, TMT could not "create a tipping point where impacts became significant." [BLNR Decision and Order, p. 222, COL 200] Thus, addition of another telescope—TMT—could not be the cause of a substantial adverse impact on the existing resources because the tipping point of a substantial adverse impact had previously been reached.

Appellants object to the principle advanced by the BLNR that "without the TMT Project, the cumulative effect of astronomical development and other uses in the summit area of Mauna Kea have previously resulted in impacts that are substantial, significant and adverse" [BLNR Decision and Order, p. 220, COL 183] and, therefore, "[t]he level of impacts on natural resources within the Astronomy Precinct of the [Mauna Kea Science Reserve (MKSR)] would be substantially the same even in the absence of the TMT Project[.]" [BLNR Decision and order,

2

p. 221 , COL 195] In other words, BLNR concludes that the degradation to the summit area has been so substantially adverse that the addition of TMT would have no substantial adverse effect. Thus, while conceding that Mauna Kea receives constitutional and statutory protection commensurate with its unchallenged position as the citadel of the Hawaiian cultural pantheon, the BLNR applies what can be described as a degradation principle to cast off cultural or environmental protection by establishing that prior degradation of the resource—to a level of damage causing a substantial adverse impact—extinguishes the legal protection afforded to natural resources in the conservation district. The degradation principle ignores the unequivocal mandate contained in Hawai'i Administrative Rules (HAR) § 13-5-30(c)(4) prohibiting a Conservation District Use Permit (CDUP) for a land use that would cause a substantial adverse impact to existing natural resources. The BLNR substitutes a new standard for evaluating the impacts of proposed land uses, a standard that removes the protection to conservation land afforded by HAR § 13-5-30(c)(4). Using the fact that the resource has already suffered a substantial adverse impact, the BLNR concludes that further land uses could not be the cause of substantial adverse impact. Under this new principle of natural resource law, one of the most sacred resources of the Hawaiian culture loses its

3

protection because it has previously undergone substantial adverse impact from prior development of telescopes.  The degradation principle portends environmental and cultural damage to cherished natural and cultural resources.  It dilutes or reverses the foundational dual objectives of environmental law—namely, to conserve what exists (or is left) and to repair environmental damage; it perpetuates the concept that the passage of time and the degradation of natural resources can justify unacceptable environmental and cultural damage.[1]

---

[1]    The duty to preserve and rehabilitate in perpetuity a resource such as Kaho'olawe that has, over time, been severely degraded by government action is a duty potentially undermined or extinguished under the new degradation principle.  See Hawai'i Revised Statutes (HRS) § 6K-3(a)(3) (1993) (requiring Kaho'olawe to be preserved and rehabilitated).  The principle is directly contrary to the purpose of the federal National Environmental Policy Act, which notes the obligation of government to protect and restore the environment:

> [I]t is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—
>
> > (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
> >
> > (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
> >
> > (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
> >
> > (4) preserve important historic, cultural, and natural aspects of our national heritage, and

(continued . . .)

It is noteworthy that the party responsible for the substantial adverse impact to this protected resource is the State of Hawai'i (State). It is uncontested that the State authorized previous construction within the Astronomy Precinct of the MKSR that created a substantial adverse impact. Thus, the party that caused the substantial adverse impact is empowered by the degradation principle to increase the damage. Now the most extensive construction project yet proposed for the Astronomy Precinct—a 180-foot building 600 feet below the summit ridge of Mauna Kea—is deemed to have no substantial adverse impact due to extensive degradation from prior development of telescopes in the summit area. The degradation principle renders inconsequential the failure of the State to meet its constitutional duty to protect natural and cultural resources for future generations. It renders illusory the public trust duty enshrined in the Constitution of the State of Hawai'i and

---

(. . . continued)

> maintain, wherever possible, an environment which supports diversity and variety of individual choice;
>
> (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
>
> (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331(b) (2012).

heretofore in the decisions of this court to protect such resources. And its policy of condoning continued destruction of natural resources once the resource value has been substantially adversely impacted is contrary to accepted norms of the environmental rule of law.

## II. The BLNR and the Majority Fail to Comply with the Requirement of HAR § 13-5-30(c)(4) that the Impact of the Thirty Meter Telescope upon the Existing Adversely Impacted Cultural Resource Be Considered

HAR § 13-5-30(c)(4) prohibits a proposed land use in the conservation district that will cause a substantial adverse impact to existing natural resources: "In evaluating the merits of a proposed land use, . . . [t]he proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region." Because "natural resources" includes cultural resources,[2] land use cannot occur in the conservation district if it causes a substantial adverse impact to existing cultural resources. HAR § 13-5-30(c)(4) sets the standard to evaluate whether the proposed land use project should be permitted. Under this standard, the impact of the proposed land use must be considered with an

---

[2] "Natural resource" as defined by the version of HAR § 13-5-2 in effect when Appellees submitted their Conservation District Use Application included "resources such as plants, aquatic life and wildlife, cultural, historic, and archaeological sites, and minerals."

understanding of the condition of the existing natural

resources.  If the land use will cause a substantial adverse

impact to the existing natural resources, it is prohibited.  The

degradation principle violates HAR § 13-5-30(c)(4) by removing

the requirement to consider the effect of a proposed land use on

the existing natural resource.  The degradation principle

reverses the requirement that the impact of the new land use be

considered; instead, the degradation principle requires that the

impact not be considered once the existing resource has suffered

a substantial adverse impact.  Consideration of the impacts of a

proposed land use becomes irrelevant because the existing

resource is already substantially degraded [3].

It is undisputed that the relevant area of the TMT

project has suffered a substantial adverse impact to cultural

resources due to the construction of twelve[4] telescopes:  "[T]he

---

[3]     The Majority states that the "BLNR does not have license to
endlessly approve permits for construction in conservation districts,
based purely on the rationale that every additional facility is purely
incremental.  It cannot be the case that the presence of one facility
necessarily renders all additional facilities as an 'incremental'
addition."  Majority Opinion at 55 (quoting Kilakila 'O Haleakalā v.
Bd. of Land & Nat. Res., 138 Hawai'i 383, 404, 382 P.3d 195, 216
(2016)).  However, the increment with the greatest impact of all
telescopes, TMT, is deemed to not cause a substantial adverse impact
because prior increments of telescope construction cumulatively caused
a substantial adverse impact.

[4]     The Astronomy Precinct of the MKSR "currently has eight
optical / infrared observatories, three submillimeter observatories
and a radio telescope."  [BLNR Decision and Order p. 219, COL 179]
Eight of these facilities became operational between 1970 and 1992;
four became operational between 1996 and 2002.  [BLNR Decision and

(continued . . .)

cumulative effects of astronomical development and other uses in the summit area of Mauna Kea have previously resulted in impacts that are substantial, significant and adverse." [BLNR Decision and Order p. 220, COL 183] Understandably, the proscription against imposition of a substantial adverse impact upon conservation district land contained in HAR § 13-5-30(c)(4) must be applied in light of the purpose of the chapter of which it is a part. See Kilakila, 138 Hawaiʻi at 405, 382 P.3d at 217. The purpose of HAR Title 13, Chapter 5 is to conserve, protect and preserve the important natural and cultural resources of the State of Hawaiʻi in the conservation district: "The purpose of this chapter is to regulate land-use in the conservation district for the purpose of conserving, protecting, and preserving the important natural and cultural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety, and welfare." HAR § 13-5-1. To effectuate the protection of cultural resources in the conservation district mandated in HAR Chapter 13-5, HAR § 13-5-30(c)(4) was adopted to prohibit land use that will cause a substantial adverse impact on cultural

---

(. . . continued)

Order p. 21, FOF 134] HAR § 13-5-30(c)(4), the rule protecting natural resources from substantial adverse impacts, was adopted in 1994.

resources.  The legislative history, the record of legislative intent preceding HAR § 13-5-30(c)(4), is an unequivocal expression of intent to protect conservation land from the consequences of the degradation principle.  Rather than promote further degradation of conservation land that, in its "existing" condition, has been substantially adversely impacted, i.e., degraded, the Hawaiʻi State Legislature (legislature) created a management framework that protects against further degradation. The companion statute that authorized the implementation of HAR § 13-5-30(c)(4) is HRS Chapter 183C.  Its purpose is to conserve, protect, and preserve natural and cultural resources in the conservation district—not to establish a process permitting the degradation of such a resource once the resource has been substantially adversely impacted:

> The legislature finds that lands within the state land use conservation district contain important natural resources essential to the preservation of the State's fragile natural ecosystems and the sustainability of the State's water supply.  It is therefore, the intent of the legislature to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare.

HRS § 183C-1 (2011).  The adoption of HAR § 13-5-30(c)(4) in 1994 was intended to implement the purpose of HRS Chapter 183C, namely "clarify[ing] the department's jurisdictional and management responsibilities within the State conservation district."  H. Stand. Comm. Rep. No. 491, in 1994 House Journal, at 1057.  To clarify the responsibility of the State to

conserve, protect, and preserve natural resources, mandatory language prohibiting land use that causes substantial adverse impact on natural resources, including cultural resources, was codified.[5]  The legislative history of HRS § 183C-1 and HAR § 13-5-30(c)(4) contains no discussion of or allusion to the degradation principle; instead, its import is to provide more clear protection for Hawaii's natural resources by preventing further damage to conservation land already subjected to substantial adverse impacts.[6]

---

[5]    HAR § 13-5-30(b) provides that, "[u]nless provided in this chapter, land uses <u>shall not</u> be undertaken in the conservation district." (Emphasis added).  HAR § 13-5-30(c) provides that, "[i]n evaluating the merits of a proposed land use, the department or board <u>shall</u> apply the following criteria." (Emphasis added).  We have interpreted this language to mean that a proposed land use is "prohibit[ed]" if it violates HAR § 13-5-30(c)(4), the fourth of these criteria.  Majority Opinion at 54.  As noted, consistent with the clarification of the State's duty to protect cultural resources, the 1994 passage of HAR § 13-5-30(c)(4) specifically defined natural resources to include cultural resources.

[6]    HAR § 13-5-30(c)(4) protects natural resources in the conservation district from any land use that causes a substantial adverse impact.  HAR § 13-5-30(c)(4) does not allow this protection to be balanced against any competing interest, such as economic value from the proposed land use.  If the proposed land use will cause a substantial adverse impact to the existing cultural resource, no amount of compensation or economic benefit is legally capable of justifying the impact.  This is in contrast to other Hawaiʻi resource management regimes, such as the Coastal Zone Management statute, which explicitly requires a balancing test:

> No development shall be approved unless the authority [designated by the county] has first found . . . [t]hat the development will not have any substantial adverse environmental or ecological effect, except as such adverse effect is minimized to the extent practicable and clearly outweighed by public health, safety, or compelling public interests.

(continued . . .)

As noted, the BLNR's decision reverses the standard of protection in HAR § 13-5-30(c)(4) requiring evaluation of the impacts of TMT on existing natural resources.  The new "reversed" standard ignores the fact that the existing resource has been substantially adversely impacted.  The degradation principle eliminates the analytical requirement of HAR § 13-5-30(c)(4) that a determination be made as to whether the proposed land use will have a substantial adverse impact on the resource as it exists.  Instead, the degradation principle provides that, once the resource has been substantially adversely impacted, the impact of the proposed land use cannot cause a substantial adverse impact.  In this way, the BLNR omits the requirement of HAR § 13-5-30(c)(4) that, regardless of whether the existing resource has previously sustained substantial adverse impact, the impacts of the construction of TMT on existing resources must be considered to determine whether TMT will cause a substantial adverse impact.  The BLNR's decision directly contradicts this court's holding in Kilakila that required the

_____

(. . . continued)

HRS § 205A-26(2)(A) (2017).  Unlike the Coastal Zone Management regulatory regime, under HAR § 13-5-30(c)(4), economic benefit is not available as a justification for a project that will cause a substantial adverse impact on natural resources in the conservation district.  A change of the land use classification to a designation other than conservation land would be necessary.

11

proposed land use to be considered in the context of "existing natural resources within the surrounding area, community, or region."  HAR § 13-5-30(c)(4); see 138 Hawaiʻi at 403, 382 P.3d at 215 (considering the impacts of a telescope in the context of the cultural resources of the site on which it was proposed to be located).

Thus, the BLNR and the Majority acknowledge past telescope projects have had a substantial adverse impact on cultural resources,[7] specifically that the cumulative effect of

_____

[7]    The BLNR described these impacts as being substantial, significant, and adverse:

> At the summit ridge, the existing observatories obscure portions of the 360-degree panoramic view from the summit area.  Overall, the existing level of the cumulative visual impact from past observatory construction projects at the summit ridge area has been considered to be substantial, significant, and adverse.
>
> Development of the existing observatories also significantly modified the preexisting terrain.  The tops of certain puʻu, or cinder cones, were flattened to accommodate the foundations for observatory facilities. Some materials removed from the puʻu were pushed over the sides of the cinder cones, creating steeper slopes that are more susceptible to disturbance.  Consequently, the existing level of cumulative impact from preexisting observatories on geology, soils, and slope stability is considered to be substantial, significant, and adverse.

[BLNR Decision and Order, p. 21-22, FOF 136-37 (internal numbering and exhibits omitted)]  The United Kingdom Infrared Telescope, specifically, was constructed on the summit ridge, which the BLNR described as "a more sensitive cultural area."  [BLNR Decision and Order, p. 31, FOF 182]  It found that the United Kingdom Infrared Telescope and the James Clark Maxwell Telescope obstruct views to the west, and the 2.2-meter telescope and NASA Infrared Telescope Facility obstruct views to the north.  [BLNR Decision and Order, p. 157, FOF 854]

(continued . . .)

12

astronomical development on Mauna Kea and other uses of the

summit area "have already resulted in substantial, significant

and adverse impacts[.]"  Majority Opinion at 55.  Yet, based on

the fact that the condition of the existing resource has already

---

(. . . continued)

      The Majority's conclusion that TMT will not have a substantial adverse impact on existing natural resources comes with little explanation, other than to make clear that it is relying upon the reasoning of the BLNR in its Decision and Order.  Majority Opinion at 59 (accepting the BLNR's finding that "the TMT project will not cause substantial adverse impact to the existing natural resources within the surrounding area, community, or region under HAR § 13-5-30(c)(4)").

      Though the Majority accepts the BLNR's conclusion of no substantial adverse impact, it provides no explanation as to how the BLNR reached its conclusion.  It does not discuss the BLNR's proposition that the substantial adverse impacts already imposed on the cultural resources mean that TMT could not be the cause of a substantial adverse impact.  Instead, the Majority begs the question. It states as a premise that TMT does not cause a substantial impact and restates the premise as its conclusion.  Thus, the Majority avoids an analysis of whether TMT causes a substantial adverse impact to the existing natural resources.  The Majority lists resources that the BLNR concluded will not be affected, including cultural resources, and states that because they are not substantially adversely impacted, the BLNR was correct in concluding there is no substantial adverse impact:

> Because (1) the TMT will not cause substantial adverse impact to existing plants, aquatic life and wildlife, cultural, historic, and archaeological sites, minerals, recreational sites, geologic sites, scenic areas, ecologically significant areas, and watersheds, (2) the abandoned Poli'ahu Road will be restored, (3) five telescopes will be decommissioned, and (4) mitigation and other measures will be adopted, the BLNR did not clearly err in concluding that the TMT will not have a substantial adverse impact to existing natural resources within the surrounding area, community, or region, as prohibited by HAR § 13-5-30(c)(4).

Majority Opinion at 59-60.  Most of the Majority's opinion regarding HAR § 13-5-30(c)(4) is spent discussing the mitigation measures.  The focus on mitigation by the BLNR and the Majority supports the conclusion that the project will cause a substantial adverse impact.

reached the point of substantial adverse impact, the proposed land use escapes scrutiny as to whether it will cause a substantial adverse impact; the "tipping point" beyond which impacts become substantial has already been reached due to the cumulative impacts of prior telescope development. The TMT project cannot, therefore, be the tipping point to cause a substantial adverse impact. The signature purpose of HAR § 13-5-30(c)(4), to prevent land use that will cause a substantial adverse impact to natural resources in the conservation district, is extinguished. Without the protection afforded by HAR § 13-5-30(c)(4) and HRS § 183C-1, the way is open to a conclusion fraught with illogic: the construction of a telescope the magnitude of TMT will not cause a substantial adverse impact to a natural resource of undisputed significant cultural value—notwithstanding that the resource has already been substantially adversely impacted by construction of twelve existing buildings of lesser size. The real severity of the impact to the resource is made apparent by the effort of the BLNR and the Majority to mitigate the project's effects with conditions that—though ineffective—support that Mauna Kea will be substantially adversely impacted when TMT is constructed.[8]

---

[8] Although the Majority concludes that, in its degraded condition, the existing resource will not be substantially adversely impacted by the TMT project, it takes a contradictory position

(continued . . .)

14

---

(. . . continued)

implying acknowledgment that TMT will cause a substantial adverse impact that must be mitigated. The Majority seeks to mitigate the damage TMT will cause. It relies upon the University of Hawai'i at Hilo's (University) agreement to decommission three telescopes, the Very Long Baseline Array antenna, and one additional observatory. The Majority presumes that the impact from TMT will become less than substantial once the mitigation measures are complete. However, HAR § 13-5-30(c)(4) prohibits land use in the conservation district where the land use will cause a substantial adverse impact. Thus, restoration of cultural resources to a condition that is not substantially adversely impacted must occur before a Conservation District Use Permit is granted.

Moreover, the mitigation measures adopted by the BLNR and the Majority do not constitute reasonable mitigation measures. They are illusory. Three of the telescopes have no required date of decommissioning. Instead, removal is relegated to an undefined point in the future when it is "reasonably possible" to remove them. These aspirational measures appear in Special Conditions 10 and 11 of the permit:

> The University will decommission three telescopes permanently, as soon as reasonably possible, and no new observatories will be constructed on those sites. This commitment will be legally binding on the University and shall be included in any lease renewal or extension proposed by the University for Mauna Kea;

> . . . [C]onsistent with the Decommissioning Plan, at least two additional facilities will be permanently decommissioned by December 31, 2033, including the Very Long Baseline Array antenna and at least one additional observatory.

[BLNR Decision and Order p. 267, DO 10-11 (internal numbering omitted)] If the University fails to decommission the five telescopes, the BLNR would be authorized, but not required, to revoke the permit for TMT. See HAR § 13-5-44. Given that the BLNR speculates that the time it would take for TMT to become operational is a reasonable amount of time in which to decommission three telescopes, [BLNR Decision and Order, p.31, FOF 179] it seems highly unlikely that the BLNR would revoke the TMT permit after this reasonable amount of time has passed—that is, when TMT becomes operational. Even if the permit were revoked due to a failure to decommission the other telescopes, it is not clear that there would be adequate funding to decommission TMT before 2033. [BLNR Decision and Order, p.67, FOF 360] These conditions are little more than aspirational goals, as their enforcement would depend on action taken

(continued . . .)

15

The degradation principle is antithetical to the intent expressed in HAR Chapter 13-5 to provide protection to natural resources in the conservation district. It causes cultural resources protected from substantial adverse impact to lose protection once they are substantially impacted in an adverse manner. The import of this method of rejecting the protection afforded to conservation land is the authorization of degradation of resources with utmost cultural and environmental importance. And so it has happened in the instant case.

### III. The Degradation Principle Violates Norms of Environmental Law

Norms of environmental law support the legislature's intent to protect natural resources on conservation land—notwithstanding that it has been previously subjected to a substantial adverse impact. The degradation principle, on the other hand, violates norms of environmental law. It allows further environmental and cultural damage to occur in a region

---

(. . . continued)

by the very entity presently granting the permit—the BLNR. And the term "as soon as reasonably possible" is vague enough as to be effectively unenforceable. These supposed conditions are ineffective as mitigation measures because their failure can occur at any time up to the completion of the construction of TMT, at which time they are highly unlikely to be put into effect. Rather than mitigating the adverse impact of TMT, they will permit further degradation of the resource that, in its existing condition, has already been substantially adversely impacted.

of great cultural significance because the cultural resource has been previously substantially degraded and compromised.  This justification for acceleration of damage to a protected resource runs contrary to the intent embodied in Article XII, section 7 and Article XI, section 9 of the Constitution of the State of Hawai'i (Hawai'i Constitution) to protect cultural and environmental rights.  The degradation principle also contravenes international law that protects the outstanding value of cultural and natural resources, notwithstanding degradation to the resource.  These norms include intergenerational equity, polluter pays, and non-regression.

A.    **Cultural and Environmental Rights Embodied in the Hawai'i Constitution**

The degradation principle contravenes provisions of the Hawai'i Constitution that protect cultural and environmental rights.  Article XII, section 7 affirms and protects the rights of Native Hawaiians to engage in traditional and customary practices.  Under Article XI, section 9, every person holds a substantive "right to a clean and healthful environment[.]"  Contrary to Article XII, section 7, and Article XI, section 9, the degradation principle teaches that once a natural resource in the conservation district is degraded to the degree that it has suffered a substantial adverse impact, it is no longer

17

worthy of protection; it bares insufficient worth to protect the resource from additional proposed development.

This court has held that "'[t]he right to a clean and healthful environment' is a substantive right guaranteed to each person by Article XI, section 9 of the Hawai'i Constitution[.]" In re Application of Maui Elec. Co., 141 Hawai'i 249, 261, 408 P.3d 1, 13 (2017) (quoting Haw. Const. art. XI, § 9). Article XI, section 9 provides:

> Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

In Maui Electric, this court classified this right as "a property interest protected by due process." Maui Elec., at 261, 408 P.3d at 13. The right to a clean and healthy environment is enumerated in laws relating to the environment including, for example, those that prohibit a proposed land use in a conservation district when it will "cause [a] substantial adverse impact to existing natural resources[.]" HAR § 13-5-30(c)(4). The degradation principle undermines the right to a clean and healthy environment because it allows unimpeded destruction of the environment once a determination is made that the natural resource protected from substantial adverse impacts within the conservation district has been subject to

18

"substantial, significant and adverse" impacts from development. Majority Opinion at 55.  Similarly, the degradation principle vitiates the right to practice Native Hawaiian traditional and customary practices embodied in Article XII, section 7 of the Hawai'i Constitution[9] whenever the cultural practices have been subjected to a substantial adverse impact in the conservation district.

## B.    Intergenerational Equity

The State holds Hawaii's natural resources in trust "[f]or the benefit of present and future generations[.]"[10]  Haw. Const. art. XI, § 1.  This court has consistently emphasized the

_____

[9]    "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights."  Haw. Const. art. XII, § 7; see, e.g., In re Wai'ola O Moloka'i Inc., 103 Hawai'i 401, 409, 83 P.3d 664, 672 (2004) (holding that the Commission on Water Resource Management "failed to discharge its public trust duty to protect native Hawaiians' traditional and customary gathering rights, as guaranteed by . . . [A]rticle XII, section 7 of the Hawai'i Constitution"); Kalipi v. Hawaiian Tr. Co., 66 Haw. 1, 4, 656 P.2d 745, 748 (1982) (recognizing this court's obligation to protect and enforce the rights of Native Hawaiians to exercise traditional and customary practices embodied in Article XII, section 7 of the Hawai'i Constitution).

[10]    See, e.g., In re 'Īao Ground Water Mgmt. Area High-Level Source Water Use Permit Applications, 128 Hawai'i 228, 276, 287 P.3d 129, 177 (2012); Kelly v. 1250 Oceanside Partners, 111 Hawai'i 205, 222-23, 140 P.3d 985, 1002-03 (2006); In re Wai'ola O Moloka'i, 103 Hawai'i at 429–31, 83 P.3d at 692–94; In re Water Use Permit Applications (Waiāhole I), 94 Hawai'i 97, 113, 129-32, 138-39, 141, 189, 9 P.3d 409, 425, 441-44, 450-51, 453, 501 (2000); Robinson v. Ariyoshi, 65 Haw. 641, 674, 658 P.2d 287, 310 (1982).

responsibility held by the State to ensure that the rights of future generations are preserved. E.g., Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kaua'i, 133 Hawai'i 141, 172, 324 P.3d 951, 982 (2014) ("The public trust is, therefore, the duty and authority to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial uses."); Kelly, 111 Hawai'i at 221–23, 140 P.3d at 1001–03 (discussing this court's adoption of the public trust doctrine and the principle of intergenerational equity embodied therein); Waiāhole I, 94 Hawai'i at 141, 9 P.3d at 453 ("Under the public trust, the state has both the authority and duty to preserve the rights of present and future generations in the waters of the state."); Robinson, 65 Haw. at 674, 658 P.2d at 310 (recognizing the State's concomitant duty to protect water for future generations and ensure that water is "put to reasonable and beneficial uses").[11]

---

[11] U.S. courts have recognized that the federal government owes a public trust duty to present and future generations. In Juliana v. United States, the U.S. District Court for the District of Oregon ruled that a group of young environmental activists between the ages of eight and nineteen (plaintiffs) had standing to assert substantive due process and public trust claims against the U.S. government based on its failure to adopt adequate measures to decrease the country's reliance on fossil fuels and reduce carbon emissions. Juliana v. United States, 217 F.Supp.3d 1224, 1233, 1267 (D. Or. 2016), motion to certify appeal denied, No. 6:15-CV-01517-TC, 2017 WL 2483705 (D. Or. June 8, 2017). The plaintiffs argued that the U.S. government has "known for over fifty years that carbon dioxide ("$CO_2$") produced by burning fossil fuels were destabilizing the climate system

(continued . . .)

The BLNR promotes an analysis that requires it to ignore the impacts to future land uses arising from the cumulative effect of twelve telescopes built over the last fifty years in the MKSR.  Future generations do not receive the benefit of protection of the cultural resource in the future because past substantial adverse impacts render it unnecessary to determine future impacts from TMT.  In <u>Unite Here! Local 5 v. City & Cty. of Honolulu</u>, 123 Hawaiʻi 150, 231 P.3d 423 (2010) this court rejected a similar decision to ignore impacts of a proposed land use.  In <u>Unite Here!</u>, this court emphasized the importance of considering future impacts from proposed development decisions.  The case arose from a proposed expansion of Kuilima Resort at Turtle Bay (Kuilima) on the North Shore of Oʻahu.  <u>Unite Here!</u>, 123 Hawaiʻi at 154, 231 P.3d at 427.  In 1985, Kuilima submitted an environmental impact statement (EIS) to the Department of Land Utilization.  <u>Id.</u>  The EIS identified various adverse impacts of the development including "drainage, traffic, dust generation, water consumption, marsh drainage input, loss of agricultural uses, construction noise, air

---

(. . . continued)

in a way that would 'significantly endanger plaintiffs, with the damage persisting for millennia.'"  <u>Id.</u> at 1233.  The court granted the plaintiffs standing because they established that the "youth and future generations" would suffer harm "in a concrete and personal way."  <u>Id.</u> at 1224, 1267.

21

quality, and sold waste disposal." Id. at 155, 231 P.3d at 428. Over the course of the next twenty years, the project encountered several delays. Id. at 157, 231 P.3d at 430. In 2005—twenty years after the permit was granted—Kuilima submitted a Site Development Division Master Application Form and contended there was no basis for a supplemental EIS (SEIS) to assess changes to the surrounding area. Id. at 154, 159, 231 P.3d at 427, 432. The Department of Planning and Permitting agreed; it ruled that no SEIS was required because "[n]o time frame for development was either implied or imposed by the City Council as part of its [original] approval." Id. at 159, 231 P.3d at 432. Kuilima was allowed to proceed without conducting a SEIS.

Despite the fact that twenty years had passed since the initial project proposal, the circuit court affirmed the Department of Planning and Permitting's decision. Id. at 166-67, 231 P.3d at 439-40. It ruled "that a SEIS is required only when there is a substantive project change and . . . that, as a matter of law, the timing of the project had not substantively changed." Id. This meant that absent a substantial change in the proposal itself, the original "EIS would remain valid in perpetuity and no SEIS could ever be required[.]" Unite Here! Local 5 v. City & Cty. of Honolulu, 120 Hawai'i 457, 472, 209

22

P.3d 1271, 1286 (App. 2009) (Nakamura, J., dissenting), vacated, 123 Hawaiʻi 150, 231 P.3d 423 (2010).

This court reversed the ICA's decision. The court found it significant that substantial, cumulative changes in the area occurred between 1985 and 2005. Unite Here!, 123 Hawaiʻi at 179, 231 P.3d at 452. This included a dramatic increase in traffic and the introduction of endangered and threatened species in the area, including the monk seal and green sea turtle. Id. The court held that the timing of the project had substantively changed and this change had a significant effect on the project. Id. at 180, 231 P.3d at 453. The passage of twenty years created "an 'essentially different action'" than the one proposed, necessitating an SEIS. Id. at 178, 231 P.3d at 451. In Unite Here!, this court contemplated "changes in the project area and its impact on the surrounding communities[.]" Id. In doing so, we considered the impacts of the proposed development on the rights and interests of future generations. Rather than freeze the analysis of the impacts by considering only a period twenty years in the past, this court recognized that the interests of subsequent generations required that the impacts on the resource be considered at the time the construction was to occur.

The BLNR would return to the proposition rejected in Unite Here! that a project need not take into consideration the

23

impacts of the proposed land use on the resource as it presently exists. The degradation principle removes the need to consider the impacts of TMT on the existing resource; once the existing cultural resource has been substantially adversely impacted, it is unnecessary to consider whether a future land use would cause a substantial adverse impact. In this way the BLNR ignores the rights of future generations to the protections specifically afforded them by the rule adopted in 1994, which mandates that "the proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region." HAR § 13-5-30(c)(4). The legislature did not intend that the rights of future generations to the protection of Mauna Kea be ignored by disregarding the impact of the TMT project on a resource already substantially adversely impacted by the construction of twelve telescopes.

Application of the degradation principle disregards the rights of future generations. It creates a threshold condition of damage—substantial adverse impact—that, once met, renders the resource available for future degradation. In so doing, the degradation principle presumes there is no natural resource value left to protect. The actions of prior and present generations extinguish the chance for future generations to protect the environmental and cultural heritage that once enjoyed legal protection. Future generations are left with the

24

proposition enshrined in the degradation principle that incremental degradation to "the highest mountain peak in the Hawaiian Islands" and one that "is of profound importance in Hawaiian culture" justifies significant future degradation if the degradation attains a substantial adverse degree.  Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res. (Mauna Kea I), 136 Hawai'i 376, 399, 363 P.3d 224, 247 (2015).[12]

---

[12]    Intergenerational equity is a tenet of international law. Principle 3 of the Rio Declaration on Environment and Development prescribes the boundaries of intergenerational equity:  "The right to development must be fulfilled so as to equitably meet developmental and environmental needs of present and future generations."  Rio Declaration on Environment and Development, princ. 3, June 14, 1992, 31 I.L.M. 874, U.N. Doc. A/CONF.151/26.  The International Court of Justice (ICJ) recognized intergenerational equity as early as 1996. In Legality of the Threat or Use of Nuclear Weapons, the ICJ noted "the environment is not an abstraction but represents the living space, the quality of life and the very health of human beings, including generations unborn."  Legality of the Threat or Use of Nuclear Weapons, ICJ Reports 1996, p. 241, ¶ 29.  The Supreme Court of the Republic of the Philippines recognized the rights of future generations in Juan Antonio, et al. v. Fulgencio S. Factoran, Jr., G.R. No. 101083, 224 S.C.R.A. 792 (S.C. July 30, 1993) (Phil.).  In the Juan Antonio case, the petitioners asserted claims to prevent mass deforestation based on the rights of "their generation as well as generations unborn."  Juan Antonio, 224 S.C.R.A. at 798.  The court's decision arose from the principle of  intergenerational equity:

> We find no difficulty in ruling that they can, for
> themselves, for others of their generation and for the
> succeeding generations, file a class suit.  Their
> personality to sue in behalf of the succeeding generations
> can only be based on the concept of intergenerational
> responsibility insofar as the right to a balanced and
> healthful ecology is concerned.  Such a right, as
> hereinafter expounded, considers the "rhythm and harmony of
> nature."  Nature means the created world in its entirety.
> Such rhythm and harmony indispensably include, inter alia,
> the judicious disposition, utilization, management, renewal
> and conservation of the country's forest, mineral, land,

(continued . . .)

## C.   Polluter Pays Principle

The polluter pays principle seeks to deter environmental degradation by imposing liability on the polluter. See Joslyn Mfg. Co. v. Koppers Co., 40 F.3d 750, 762 (5th Cir. 1994). Polluters must pay for the cost of restoring the value of the site damaged by their own activities and those impacted by the damage. Courts in the United States have applied polluter pays to remedy harm to the environment. E.g., United States v. Capital Tax Corp., 545 F.3d 525, 530 (7th Cir. 2008) (recognizing that the government can recover damages from responsible parties to clean up hazardous waste because "the 'polluter pays'" under Title 42, Sections 9606(a) and 9604(a) of the United States Code); Joslyn Mfg. Co., 40 F.3d at 762 (ordering the polluter to pay the cost of restoring a

---

(. . . continued)

> waters, fisheries, wildlife, off-shore areas and other natural resources to the end that their exploration, development and utilization be equitably accessible to the present as well as future generations. Needless to say, every generation has a responsibility to the next to preserve that rhythm and harmony for the full enjoyment of a balanced and healthful ecology. Put a little differently, the minors' assertion of their right to a sound environment constitutes, at the same time, the performance of their obligation to ensure the protection of that right for the generations to come.

Id. at 798-99. See also Vellore Citizens Welfare Forum v. Union of India, AIR 1996 SC 1, 11 (India) (recognizing that intergenerational equity is a cornerstone of the customary international law principle of sustainable development). Thus, intergenerational equity ensures accountability between the generations of mankind.

26

contaminated site and denying the polluter's "scheme under which it could defray part of its clean-up cost by passing the contaminated property through a series of innocent landowners and then, when the contamination is discovered, demanding contribution from each"); see also Fla. Const. art. II, § 7(b) (incorporating the polluter pays principle to protect the Everglades Agricultural Area by holding those who cause pollution "primarily responsible for paying the costs of the abatement of that pollution").

"Polluter pays" is also a principle of international law. A prominent example of its application occurred in the Trail Smelter Arbitration spanning the late 1930s and early 1040s. See Trail Smelter Case (U.S. v. Can.), 3 R.I.A.A. 1905, 1965 (Perm. Ct. Arb. 1938 and 1941). A trail smelter owned by a Canadian corporation emitted noxious sulphur dioxide fumes that drifted and harmed crops in the United States. Id. at 1917, 1965. The Permanent Court of Arbitration[13] held Canada

---

[13] The Permanent Court of Arbitration is an intergovernmental organization with 121 contracting parties (states) located in the Hague. Permanent Court of Arbitration, https://pca-cpa.org/en/home/ (https://perma.cc/B2V9-TCC9) (last visited Nov. 7, 2018). It was formally established through the Convention for the Pacific Settlement of International Disputes in 1899, arising out of a need for a forum to conduct dispute resolution among states. Id.

financially responsible for the damage and accorded compensation

to the United States:

> [U]nder the principles of international law, as well as the
> law of the United Sates, no State has the right to use or
> permit the use of its territory in such a manner as to
> cause injury by fumes in or to the territory of another or
> the properties or persons therein, when the case is of
> serious consequence and the injury is established by clear
> and convincing evidence . . . . Considering the
> circumstances of the case, the Tribunal holds that the
> Dominion of Canada is responsible in international law for
> the conduct of the Trail Smelter.

Id. Therefore, the polluter was liable for the environmental

and economic harm caused by its pollution. Similarly, in the

seminal case Vellore Citizens Welfare Forum v. Union of India &

Ors., the Supreme Court of India recognized the polluter pays

principle as a tenet of sustainable development—a principle of

customary international law. AIR 1996 SC 1, 11-13, 22 (India).

A citizens' group challenged tanneries that were releasing

untreated effluent into surrounding waterways and land. Id. at

1. The court defined polluter pays:

> [T]he absolute liability for harm to the environment
> extends not only to compensate the victims of pollution but
> also the cost of restoring the environmental degradation .
> . . . [P]olluter is liable to pay the cost to the
> individual sufferers as well as the cost of restoring the
> environmental degradation.

Id. at 12. The court ordered the formation of an official

authority to implement the polluter pays principle to determine

the costs of repaying victims and restoring the environment.

Id. at 22.[14]

The Judicial Committee of the Privy Council, reviewing

an appeal from Trinidad and Tobago,[15] recently applied the

polluter pays principle to address water pollution regulations:

> The Polluter Pays Principle . . . is now firmly established
> as a basic principle of international and domestic
> environmental laws.  It is designed to achieve the
> "internalization of environmental costs", by ensuring that
> the costs of pollution control and remediation are borne by
> those who cause the pollution, and thus reflected in the
> costs of their goods and services, rather than borne by the
> community at large.

Fishermen & Friends of the Sea v. the Minister of Planning,

Hous. & Env't [2017] UKPC 37 ¶ 2 (appeal taken from Trinidad and

---

[14]     In the absence of an express statutory or constitutional
mandate, the court integrated international norms into domestic law.
It noted that when customary international law does not directly
contradict domestic law, it is inherently incorporated into domestic
law:

> In view of the above mentioned constitutional and
> statutory provisions we have no hesitation in holding that
> the precautionary principle and the polluter pays
> p[r]inciple are part of the environmental law of the
> country.
>
> Even otherwise once these principles are accepted as part
> of the Customary International Law there would be no
> difficultly in accepting them as part of the domestic law.
> It is almost accepted proposition of law that the rule of
> Customary International Law which are not contrary to the
> municipal law shall be deemed to have been incorporated in
> the domestic law and shall be followed by the Courts of
> Law.

Vellore Citizens, AIR 1996 SC at 13.  Therefore, the court
incorporated the polluter pays principle into its analysis.

[15]     Lord Carnwath, assigned from the Supreme Court of England,
authored the opinion of the Council.

Tobago).[16]  In <u>Fishermen and Friends</u>, a non-profit organization

challenged a regulation promulgated by the Minister of Planning,

Housing and the Environment that prescribed fixed fee amounts

for cases of pollution or environmental degradation.  <u>Id.</u> ¶¶ 6-

7.  The regulation was promulgated under the National

Environmental Policy which codifies the polluter pays principle.

<u>Id.</u> ¶ 5.  Section 2.3(b) of the National Environmental Policy

mandates that money collected from polluters "will be used to

correct environmental damage."  <u>Id.</u>  The regulation was

challenged as inadequate because it imposed a flat fee on all

polluters as opposed to a fee based on actual damage:

> "As a result of the flat fee model which has been selected, no fees collected are being used to correct environmental damage.  This also has a consequential effect in respect of proportionality, as there is no ability to tailor the fee to meet the degree of damage which might be caused by different permittees.  The costs associated with rectifying environmental damage will obviously vary according to the pollution load, pollutant profile, sensitivity of receiving environment and toxicity."

<u>Id.</u> ¶ 38.  Under this reasoning, the court found that the

regulation did not adequately incorporate the polluter pays

principle and failed to comply with the National Environmental

---

[16]     In 2001, the Minister of Planning, Housing and the Environment promulgated the Water Pollution Rules and the Water Pollution (Fees) Regulations.  <u>Fishermen & Friends</u>, ¶¶ 15-16.  The Rules and Regulations established a permitting system whereby permittees that were releasing water pollutants above permissible levels were required to pay a "prescribed fee."  <u>Id.</u> ¶ 15.  "The fee did not vary according to the type or amount of the pollution permitted" and therefore did not apply polluter pays.  <u>Id.</u> ¶ 16.

Policy.  <u>Id.</u> ¶¶ 43, 45, 53.  The court enforced the polluter pays principle to ensure that polluters are held accountable for the actual harm caused by their development.

The Majority recognizes that the University is responsible for the substantial adverse impacts caused by its development in the summit area of Mauna Kea.[17]  It is the "polluter" that caused cultural harm.  Under the Majority's opinion, the polluter pays principle is reversed.  The polluter is permitted to benefit from degradation so adverse that the removal of five telescopes—identified by the BLNR and the Majority—would be necessary to mitigate the substantial adverse impact upon cultural resources.  The protection of conservation land for future generations afforded by the polluter pays principle is lost.

**D.    Non-regression Principle**

The principle of non-regression imposes an affirmative obligation to not regress, or backslide, from existing levels of legal protection.  This principle is generally applied in the context of cultural and social rights, and environmental law. The Clean Water Act,[18] for example, mandates a "general

---

[17]     The University began operating observatories on Mauna Kea in 1968.

[18]     Clean Water Act, 33. U.S.C. § 1362 (2014).

prohibition on backsliding[.]"[19]  Cmtys. for a Better Env't v. State Water Res. Control Bd., 34 Cal. Rptr. 3d 396, 406 (Cal. Ct. App. 2005), as modified (Sept. 27, 2005).  It ensures that "subsequent permit effluent limits that are comparable to earlier ones are not allowed to 'backslide,' i.e., be less stringent."  Id.

Nations have included the principle of non-regression in treaties and domestic legislation.  For example, the Regional Agreement on Access to Information, Public Participation and Justice in Environmental Matters between Latin America and the Caribbean, adopted in March 2018, provides that the parties shall be guided by the principle of non-regression.  Regional Agreement on Access to Information, Public Participation and Justice in Environmental Matters in Latin America and the Caribbean art. 3(c), March 4, 2018, https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XXVII-18&chapter=27&clang=_en z (https://perma.cc/AVK7-5YGM). The European Parliament (Parliament) also applies the non-

---

[19]    The U.S. District Court for the Northern District of California has recognized that the Clean Air Act also implements a non-regression policy.  WildEarth Guardians v. Jackson, 870 F.Supp.2d 847, 850 (N.D. Cal. 2012), aff'd sub nom. WildEarth Guardians v. McCarthy, 772 F.3d 1179 (9th Cir. 2014) ("In 1977, Congress further amended the Clean Air Act to add requirements designed to ensure not only that certain air quality standards were attained, but also that the air quality in areas which met the standards would not degrade or backslide.").

regression principle to natural resources.  Its significance as a principle of environmental protection was a central feature of the Parliament's commitment to sustainable development.  The Parliament specifically adopted a resolution that "calls for the recognition of the principle of non-regression in the context of environmental protection as well as fundamental rights[.]" Resolution of 29 September 2011 on Developing a Common EU Position Ahead of the United Nations Conference on Sustainable Development (Rio+20), Parl. Eur. Doc. P7_TA(2011)0430 (2011).  The principle of non-regression was applied by the United Nations General Assembly in 2012.  G.A. Res 66/288, ¶ 20, annex, The Future We Want (July 27, 2012).  General Assembly Resolution 66/288 recognizes that "it is critical that we do not backtrack from our commitment to the outcome of the United Nations Conference on Environment and Development."  Id. (emphasis added).

Notwithstanding prevailing international norms disfavoring backsliding on legal protection of the environment, the analysis of the BLNR and the Majority does so.  The purpose of HAR § 13-5-1 is "to regulate land-use in the conservation district for the purpose of conserving, protecting, and preserving the important natural and cultural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety, and

33

welfare."  Therefore, the natural and cultural resources in conservation districts have a baseline level of protection from usage that causes a substantial adverse impact.

The degradation principle peels away this protection. It allows further degradation based on damage cumulatively caused by prior impacts.  The BLNR's analysis regresses to a former stage of the law—when the conservation district was not protected by the proscription codified in HAR § 13-5-30(c)(4)— that conservation land may be subjected to usage that causes a "substantial, significant and adverse" impact on cultural resources.  Prior to 1994, development decisions in the conservation district did not have to account for "conserving, protecting, and preserving the important natural and cultural resources of the State[.]"  HAR § 13-5-1.  The BLNR's decision encourages regression by reversing protections for critical natural resources in the conservation district.  It employs an analysis that renders TMT invisible:  "Even without the TMT, the cumulative effect of astronomical development and other uses in the summit area of Mauna Kea have resulted in impacts that are substantial, significant and adverse."  Majority Opinion at 55 (emphasis added).  The BLNR and the Majority enhance regression by ignoring the impact of TMT.  But viewed under the correct standard contained in HAR § 13-5-30(c)(4), TMT is not invisible. The principle of non-regression made explicit in HAR § 13-5-

34

30(c)(4) requires that the effects of a 180-foot high structure, dug 21 feet into the earth, 600 feet below the summit of Mauna Kea, be considered.  The degradation principle treats any further development on the cultural resource as inconsequential because the cultural resource has already been substantially adversely impacted.  As applied to the proposed project, the degradation principle adopts a regressive approach to managing environmental and cultural resources in the conservation district that violates HAR § 13-5-30(c)(4).

## IV.  Conclusion

The degradation principle ascribes to the legislature the intent that conservation land lose its protection under the Hawaiʻi Constitution and the laws of the State of Hawaiʻi whenever it has been subjected to a substantial adverse impact. HAR § 13-5-30(c)(4) is a direct refutation of such regressive treatment of conservation land.  Instead, the legislature intended—consistent with its constitutional duty to future generations—to conserve, protect, and preserve "the important natural and cultural resources of the State through appropriate management and use to promote their long-term sustainability." HRS § 183C-1.  Appellees' Conservation District Use Application proposes a land use that cannot be permitted if it causes a substantial adverse impact on cultural resources.  HAR § 13-5-30(c)(4).  The degradation principle substitutes a contrary

35

standard that relieves the permittee of the burden to prove no substantial adverse impact—if the resource is already substantially adversely impacted.  Correctly applied—and consistent with the clear intent of Hawaii's legislature and norms of environmental law—HAR § 13-5-30(c)(4) requires that the impacts of TMT be assessed with full recognition that the existing resource has already received cumulative impacts that amount to a substantial adverse impact.  In light of the correct standard, whether TMT will have a substantial adverse impact where there already is a substantial adverse impact becomes straightforward.  The substantial adverse impacts to cultural resources presently existing in the Astronomy Precinct of Mauna Kea combined with the impacts from TMT—a proposed land use that eclipses all other telescopes in magnitude—would constitute an impact on existing cultural resources that is substantial and adverse.  Accordingly, the Conservation District Use Application for TMT must be denied.

/s/ Michael D. Wilson